UNITED STATES DISTRICT COURT          **<u>NOT FOR PUBLICATION</u>**
EASTERN DISTRICT OF NEW YORK
_____

RAHEEM DUNAWAY,

                  Petitioner,

      – against –                                   **<u>MEMORANDUM & ORDER</u>**

M. KOPP,                                             23-CV-7404 (ERK)

               Respondent.
_____

KORMAN, *J*.:

    Petitioner Raheem Dunaway, proceeding *pro se*, brings this petition for a writ

of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction by a jury

in the Supreme Court of the State of New York, Kings County, of murder in the

second degree and criminal possession of a weapon in the second degree.  For the

reasons set forth below, the petition for a writ of habeas corpus is denied.

    **I.**    **Background**

        **a. Factual Background[1]**

    This case arises from the fatal shooting of Daquan Spencer on August 21,

2016 at approximately 1:30 a.m. in Scarangella "Shady" Park in the Coney Island

area of Brooklyn.  Shady Park is located across the street from the Marlboro Houses,

---

[1] The following facts are taken from the state court record and are viewed in the light
most favorable to the prosecution.  *See Garbutt v. Conway*, 668 F.3d 79, 80 (2d
Cir. 2012).

a twenty-eight building New York City Housing Authority complex.  ECF No. 7-1 at 307, 311.[2]  At the time of the shooting, Spencer was engaged to Latoya James, and together they were raising two children.  *Id.* at 307–08.

### i.  Shooting of Daquan Spencer

On the evening of August 20, 2016, Spencer and James were hosting a birthday party for their three-year-old son at a playground in Shady Park.  *Id.* at 311.  The same night, a memorial event called "Love and Loyalty," which honored six residents of the Marlboro Houses who had died from gun violence, was also being held in Shady Park.  *Id.* at 312, 353.  Residents of the Marlboro Houses attended both events.  *Id.* at 316, 419.

At approximately 1:30 a.m. on August 21, 2016, Spencer was shot multiple times on the basketball court in Shady Park.  An ambulance took Spencer to Coney Island Hospital, where he was pronounced dead.  *Id.* at 323, 521.  An autopsy conducted the next day confirmed that Spencer had suffered seventeen gunshot wounds and one shrapnel wound to various parts of his body and that the cause of his death was multiple gunshot wounds.  *Id.* at 609, 625.

### ii.  Investigation & Arrest of Petitioner

Detectives James Riordan and James McCafferty were assigned to investigate the shooting of Spencer.  *Id.* at 538–40.  On the day of the shooting, two witnesses—

---

[2] Citation to ECF pagination.

Deja Bass (sister of Spencer) and Janice Pippins—separately informed the police that they had seen Petitioner shoot Spencer. *Id.* at 375, 467–68, 542–44. Both witnesses were familiar with Petitioner from around the Marlboro Houses, where he was known as "Jaws" and "Montana." *Id.* at 348–51, 447–48. Bass also provided the police with a photo of Petitioner from Facebook. *Id*. at 375–76.

The police issued a probable cause investigation card (I-Card)[3] for Petitioner. *Id.* at 545–46. Between August 22, 2016 and November 10, 2016, detectives unsuccessfully searched for Petitioner in and outside of New York City. *See id.* at 697–719. On November 10, 2016, at approximately 10:15 a.m., police arrested Petitioner in Longs, South Carolina, at the residence of a woman named Jessica Gore. *Id.* at 719–21. At trial, Detective Jaime Rosado, who was present for the arrest of Petitioner, testified that he believed Gore was Petitioner's girlfriend or "possible girlfriend." *Id.* at 722.

### iii.  Lineup and Identification

The following day, on November 11, 2016, Detective Riordan and Detective McCafferty arranged a lineup that consisted of Petitioner and five men who served as lineup fillers. *Id.* at 547–49. At the time, Petitioner was thirty-four years old,

---

[3] An "I-Card" is an investigation card issued by the police to alert other officers that an individual witnessed a crime, that an individual is suspected of committing a crime that has occurred, or that there is probable cause to arrest an individual for a crime that has occurred. *See* ECF No. 7-1 at 545–46.

weighed 310 pounds, and was six-feet-and-one-inch tall. *Id.* at 564. The fillers' ages ranged from thirty to fifty, and their weights ranged from 155 to 220 pounds. *Id.* The fillers resembled Petitioner in ethnicity, complexion, and facial hair. *Id.* at 94. During the lineup, Petitioner and the fillers all wore baseball caps, hospital gowns, and sheets covering their lower bodies. *Id.* at 30, 548–49, 554. The men were also seated so that they would look similar in size, and each man held a large card with his lineup number that blocked part of his body. *Id.* at 31, 91, 554.

Petitioner was permitted to choose his position in the lineup and to choose the positions of the fillers. *Id.* at 30, 549. Petitioner chose to sit in position number one and to allow the fillers to select their own positions. *Id.* at 30, 549, 554. Petitioner's then-attorney was present throughout the entire set up of the lineup and did not have any objections or suggestions for the lineup arrangement. *Id.* at 30, 547–49.

Bass and Pippins were separately called to the police station and asked to view the lineup. *Id.* at 35–40, 550–51. Bass identified Petitioner as the person who "murdered [her] brother." *Id.* at 398. At trial, she testified that she was "[a] hundred percent" confident in her identification. *Id.* Pippins likewise identified Petitioner as the person who "shot that boy in the park." *Id.* at 40, 470–71. At trial, she also testified that she was "[a] hundred percent confident" in her identification. *Id.* at 471.

### b. Procedural Background

Petitioner was indicted in the Supreme Court of the State of New York, Kings County, on one count of murder in the second degree and two counts of criminal possession of a weapon in the second degree. *See* ECF No. 7-2 at 2.

### i. Suppression Hearing

At a pretrial suppression hearing, Petitioner, who was represented by counsel, moved to suppress the in-person lineup identifications based on disparities in age and weight between the fillers and Petitioner. ECF No. 7-1 at 75–76. In particular, he argued that it was improper to have fillers who were between fifteen and twenty years older than Petitioner and fillers who weighed up to 155 pounds less than Petitioner. *Id.*

The trial judge denied Petitioner's motion. The judge found that the lineup was "devoid of any suggestion" and that the lineup participants "closely resembled the physical characteristics of [Petitioner], including approximate age, skin tone, and facial hair." *Id.* at 95–96. The judge also noted that the "detectives took steps to ensure the fairness of the lineup by having the participants remain seated, thereby eliminating possible height discrepancies" and by having "all of them dress in hospital gowns and hold up a sheet and hold up large numbers in front of their chests, thereby eliminating any meaningful weight discrepancies." *Id.* at 96. The judge observed that, in looking at the photographs of the lineup, "it is clear that none of the participants appear significantly older or younger than any of the others" and that

it is "impossible . . . to discern the precise height or the precise weight of the individuals in the lineup as they are seated." *Id.* at 97.  Moreover, the judge found that "[t]here is no evidence that the manner in which the lineups were conducted were suggestive." *Id.* at 96.

Separately, Petitioner also argued that the lineup identifications should be suppressed because he was arrested in violation of *Payton v. United States*, in which the Supreme Court held that the Fourth Amendment prohibits law enforcement officers from making a warrantless and nonconsensual entry into a home for the purpose of conducting a routine felony arrest.  445 U.S. 573, 584–90 (1980). Defense counsel contended that Petitioner, who was arrested without a warrant, had a reasonable expectation of privacy in the home in which he was arrested because he was an invited guest and that his arrest thus violated *Payton*.  ECF No. 7-1 at 73– 74.  As evidence of this, defense counsel pointed to the fact that Petitioner was "in the house with another woman" and that the police officers found Petitioner's clothes inside the house.  *Id.* at 74.

The trial judge ruled that there was no *Payton* violation in this case.  *Id.* at 84– 85.  The judge found that there was "zero evidence in this record that [Petitioner] had an expectation of privacy in the premises where he was apprehended, zero." *Id.* at 84.  In so finding, the judge noted that Petitioner told the arresting officers that he lived in Brooklyn, while he was arrested in South Carolina.  *Id.*

6

### ii. Motion to Admit Bass's 911 Call

Prior to trial, the District Attorney moved to admit into evidence the recording of a 911 call made by Bass immediately after the shooting under the excited utterance and present sense impression exceptions to the rule against hearsay. ECF No. 7-1 at 103–04. The recording of the 911 call was played at the pretrial hearing. *Id.* at 107. According to a transcript of the call included in the record, Bass told the 911 operator, among other things, that the shooter's "name is Raheem . . . they just call him Jaws Montana," that the shooter "just walked off," and that he was wearing "[a]ll black." *See* ECF No. 7-3 at 14–15.

Defense counsel requested that the court redact Bass's statements in the call that Petitioner was the shooter, that he "just walked off," and that he was wearing black. ECF No. 7-1 at 107–08. Defense counsel argued that, because Bass did not explicitly tell the 911 operator that she saw the shooting, it would be speculation to assume that she did, and thus the disputed portions of the call should not be admitted under any exception to the rule against hearsay. *Id.* at 107–11.

The trial judge ruled that the 911 call could be admitted into evidence without redactions, noting that Bass would testify at trial that she saw the shooting and would be subject to cross-examination on this point. *Id.* at 110. The judge determined that the 911 call was an excited utterance, noting that Bass was "downright hysterical," "wailing, crying, begging for assistance for her brother," and that "no time" had elapsed between the shooting and the call. *Id.* at 111–12. Moreover, the judge

determined that the 911 call was not the product of the declarant's studied reflection. *Id.* at 112. Finally, the judge concluded that the 911 call could also be admitted as a present sense impression because Bass described the events after only a marginal lag time and her statements were corroborated by other evidence. *Id.* at 113.

### iii. Trial & Sentencing

Petitioner was tried before a jury in the Supreme Court of the State of New York. At trial, James testified that she arrived at Shady Park at around 3:00 p.m. on August 20, 2016 to set up for her son's birthday party. *Id.* at 312. While in the park, James saw Petitioner, who she knew from the Marlboro Houses, and another individual, known to James as "Ra-Ra," having an altercation near the basketball court. *Id.* at 306, 309, 313. James observed that Petitioner was "[d]runk and angry." *Id.* at 313. As Petitioner and Ra-Ra were fighting, Petitioner lifted up his shirt, displaying a gun to Ra-Ra. *Id.* at 314. Petitioner's cousin, known to James as "Day-Day" or "Daquan," held Petitioner back. *Id.* at 317. James told Petitioner, who was invited to her son's birthday party, not to bring the gun to the party. *Id.* at 315. Petitioner attended the party later that day, and James observed that he was angry and "starting with everybody" and that he appeared drunk. *Id.* at 316.

The birthday party ended around 11:30 p.m., at which time some people who had attended the party walked over to the Love and Loyalty event, which was taking place on a basketball court in Shady Park. *Id.* at 318. James observed that Petitioner was there drinking. *Id.* at 319. At around 1:30 a.m., James was walking back to the

Marlboro Houses with her three-year-old son and mother when she heard five or six gunshots. *Id.* at 320–21, 343. She ran back towards the park because her older son was still there and saw Spencer lying on the basketball court with gunshot wounds. *Id.* at 321–22. James stayed with Spencer until the ambulance arrived and took him to Coney Island Hospital, where he was pronounced dead. *Id.* at 323.

Bass, Spencer's sister, also testified at trial. *Id.* at 347. She was living at the Marlboro Houses at the time of the events in question and had known Petitioner for about ten years, although she denied that they were friends or that she knew him "personally." *Id.* at 347–49. On August 20, 2021, Bass arrived at Shady Park between 4:30 p.m. and 5:00 p.m. for the birthday party. *Id.* at 353. When the birthday party ended, she went to the Love and Loyalty event. *Id.* at 355. At the Love and Loyalty event, she played basketball with some friends and, at one point, had a "regular, normal conversation" with Petitioner during which he appeared "normal, fine." *Id.* 357–58, 399, 427.

Later on, Bass was sitting with some friends in Shady Park when she heard Petitioner and his cousin, known to Bass as "Daytime," arguing as they were walking out of the park. *Id.* at 358–60, 439. She observed that both of them appeared to be angry. *Id.* at 360. Bass then also left the park to go to the store. *Id.* at 361. When Bass was approximately five feet away from Petitioner, she overheard him say to Daytime, "I'm a different type of [person]. I shoot to kill." *Id.* at 361–62, 442.

Petitioner then demanded to Daytime, "Give me my shit." *Id*. at 362. Daytime pulled a black gun out of his waistband and handed it to Petitioner. *Id.* at 362–63.

Later in the evening, back in Shady Park, Bass was talking to a friend by the basketball court when she heard shots from behind the court. *Id.* at 366, 431–32. She started to run but, after a few steps, she turned around and saw what she thought were her brother's red and white sneakers sticking up from the ground on the basketball court. *Id.* at 366–67, 402, 432–34. Bass testified that she then ran back towards the basketball court and saw Petitioner shooting Spencer. *Id.* at 367, 434. According to Bass, Petitioner and Spencer were close to one another, with Petitioner over Spencer. *Id.* at 368. Bass then screamed for Petitioner to stop. *Id.* at 367. After firing several shots, Petitioner "walked off" "not that far," and Bass moved closer to her brother. *Id.* at 368–69, 403–05. Petitioner then turned back and fired more shots at Spencer, who was on his back, with Bass now ten or fifteen feet away. *Id.* at 369–70, 403–05. Petitioner then walked away again, and Bass ran over to Spencer and called 911. *Id.* at 370–71. While Bass was on the phone with 911, James ran over and asked what had happened. *Id.* at 371.

After the ambulance arrived for Spencer, Bass went to the hospital, where she spoke to police officers about what she had seen. *Id.* at 375. She also showed a picture of Petitioner from Facebook to the police officers, and the officers printed out a copy. *Id.* at 376. Later that day, she identified Petitioner as the shooter to the police from a photo array. *See id.* at 16.

Pippins also testified at trial about the events of August 20 and 21, 2016. Pippins had lived in the Marlboro Houses most of her life and had known Petitioner as a friend of her brother for more than ten years. *Id.* at 446–48. She had also worked with the mother of Petitioner's child, who also lived in the Marlboro Houses. *Id.* at 447–48. Pippins testified that she and Petitioner did not know each other personally but that they waved and spoke to each other occasionally. *Id.* at 507.

On August 21, 2016, at around 1:30 a.m., Pippins was cleaning up from the Love and Loyalty event in the park with her nine-year-old son when she heard a popping noise from in front of her, near the basketball court. *Id.* at 458–59, 476. She looked up and, from about fifteen feet away, saw Petitioner, wearing a black hoodie, shooting down at someone who was on the ground on their back. *Id.* at 460–61, 496–97. She later learned that the person being shot at was Spencer, who Pippins did not know personally. *Id.* at 461. Pippins heard approximately fifteen to twenty shots fired in quick succession. *Id.* at 461, 493–95. Pippins testified that, as the shooting was happening, her "eyes never left [Petitioner's] face." *Id.* at 494.

After the shooting stopped, she grabbed her son and ran to a tree for protection. *Id.* at 462, 479. Petitioner walked closer to Pippins and then walked out of the park holding the gun. *Id.* at 462–64, 481, 497–98. Once outside the park, Petitioner got into a black car that drove away. *Id.* at 464, 484. Pippins called 911 and then left the park because her son was very upset. *Id.* at 465–66. Later that day, Pippins spoke to the police at the park and then at the precinct about what she had

seen. *Id.* at 467. Pippins also identified Petitioner as the shooter to the police from a photo array. *Id.* at 504–05.

During summation at trial, Petitioner's counsel argued that Bass and Pippins could not have seen the shooting clearly because the park was dark and there were many trees and people around. *Id.* at 764–67. Defense counsel also argued to the jury that Petitioner had no motive to shoot Spencer, referring to testimony from Bass that Spencer and Petitioner did not have a bad relationship and had not been seen arguing prior to the shooting. *Id.* at 769–71; *see also id.* at 344, 426–27. Defense counsel also suggested to the jury that Jeffrey Bush, another resident of the Marlboro Houses and the father of James's older child, may have had a motive to commit the shooting, relying on witness testimony that Bush and Spencer had had an altercation several years earlier. *Id.* at 771; *see also id.* at 425–26, 429–30, 491–92, 597–600.

The prosecutor, in his closing argument, made several statements to which defense counsel objected. In particular, the prosecutor stated that, on the evening and early morning in question, Petitioner was at Shady Park "intimidating" people with a gun "at an event commemorating the lives of people that died through gun violence," showing his community "what he felt . . . about people who died from the Marlboro projects." *Id.* at 778. After defense counsel objected that the prosecutor was calling for speculation, the judge reminded the jury that they could not speculate and that they should not consider arguments by counsel not based on the evidence. *Id.* at 778–79. The prosecutor then continued, calling Petitioner "arrogant,

12

bullying," "belligerent," and "boastful of" his gun. *Id.* at 779–80, 786. The prosecutor also suggested that the park where the shooting occurred was called "Shady Park" not because of the trees, as defense counsel had suggested, but because it was "[s]hady" in another sense of the word, implying that community members were afraid to speak to the police about the shooting. *Id.* at 789. The prosecutor also suggested that, by shooting Spencer twenty times, Petitioner was sending the message to witnesses: "[D]on't come forward to the policeman. I am dangerous." *Id.* at 811.

Following the prosecutor's summation, defense counsel moved for a mistrial based on the prosecution's "numerous references to other matters happening in the community" that "only served to inflame the jury and detracted from the case at hand." *Id.* at 812–13. The trial judge denied the motion, reasoning that the Love and Loyalty event was part of the case before the jury and that the court had addressed the aspects of the prosecutor's argument that it considered out of bounds. *Id.* at 813–14. While providing the jury charge, the judge also reminded the jury that the testimony about the Love and Loyalty event was only provided "as background information and to complete the narrative of what's alleged to have occurred that day." *Id.* at 829.

Two counts were submitted to the jury: murder in the second degree and criminal possession of a weapon in the second degree. *See id.* at 835–39. The jury convicted Petitioner on both counts. *Id.* at 848. Petitioner was sentenced to

13

concurrent terms of imprisonment of twenty-five years to life on the second-degree murder count and fifteen years on the second-degree weapon count, followed by five years of post-release supervision. *Id.* at 858. Petitioner is currently incarcerated at Sing Sing Correctional Facility.

### iv. Direct Appeal

Petitioner, represented by counsel, appealed the conviction. As relevant to this petition, Petitioner argued that his conviction should be reversed because Pippins and Bass were subject to a "suggestive lineup" in which he "stood out" due to his weight and age compared to the fillers, depriving him of his right to due process. ECF No. 7-2 at 23–27. He also argued that portions of the recording of Bass's 911 call should not have been admitted into evidence because "there was no evidentiary foundation for admitting the portions of the call containing the identification and the related description of and further discussion of the shooter." *Id.* at 27–32. Finally, Petitioner argued that he was deprived of due process and a fair trial because the prosecution "attacked [Petitioner] personally by repeatedly characterizing him as violent and aggressive" during summation. *Id.* at 33–37.

Petitioner also filed a *pro se* supplemental brief, in which he argued that he was denied the effective assistance of counsel at trial on several grounds. First, he argued that Detective Rosado's testimony that Petitioner was found at the home of a "possible girlfriend" established that Petitioner had an expectation of privacy in the premise where he was arrested and that, as a result, his trial counsel was

14

ineffective for failing to move to reopen the suppression hearing to explore whether he was arrested in violation of *Payton*. ECF No. 7-5 at 18–19.[4] Second, he asserted that trial counsel was ineffective for failing to offer evidence that Petitioner was drunk at the time of the instant offense, arguing that this may have negated the element of specific intent. *Id.* at 19–20. Finally, he argued that trial counsel was ineffective for failing to call Bush as a witness, alleging that Bush would have testified that he saw another assailant kill Spencer. *Id.* at 20–21.

The Appellate Division, Second Department, unanimously affirmed Petitioner's conviction. *People v. Dunaway*, 172 N.Y.S.3d 108 (App. Div. 2022). First, the court found that Petitioner had failed to establish that the lineup identification procedures were unduly suggestive, noting that the fillers "sufficiently resembled him," including with respect to age, and that the police officers took reasonable steps to conceal any differences in weight between Petitioner and the fillers. *Id.* at 111. The Appellate Division also found that the 911 call was properly admitted into evidence under the excited utterance and present sense impression exceptions to the rule against hearsay. *Id.* at 111–12. Moreover, the court found that Petitioner had failed to preserve for appellate review his arguments regarding the prosecutor's summation and that, even if he had, the "challenged remarks were largely proper as fair comments on the evidence and fair responses to the defense

---

[4] Citation to ECF pagination.

summation" and any improper remarks were harmless error. *Id.* at 112. Finally, the Appellate Division determined that Petitioner's ineffective assistance of counsel argument was based, in part, on matters appearing outside the record and thus should be raised in a motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10. *Id.*

Petitioner unsuccessfully sought leave to appeal to the Court of Appeals. *See People v. Dunaway*, 39 N.Y.3d 939 (2022). In his leave application, Petitioner sought review of all the issues that he raised to the Appellate Division in his counseled brief and his *pro se* supplemental brief. *See* ECF No. 8-2 at 2.

### v. Petition to Vacate Conviction

While his appeal to the Appellate Division was pending, Petitioner also filed a *pro se* motion to vacate his conviction pursuant to C.P.L. § 440.10 in the New York Supreme Court, Kings County. He raised the same claims of ineffective assistance of counsel that he raised in his *pro se* supplemental brief to the Appellate Division. *See* ECF No. 8-4 at 19–27.[5]

The trial court denied Petitioner's motion to vacate his conviction. *See* ECF No. 8-7. The court determined that Petitioner's trial counsel had provided meaningful representation, including by cross-examining witnesses, presenting arguments in favor of Petitioner's suppression motion, and securing the suppression

---

[5] Citation to ECF pagination.

of a statement that Petitioner made at the time of his arrest. *Id.* at 3–4. The court also found that counsel had presented cogent opening and closing remarks, in which he highlighted the lack of DNA and video evidence and attacked the credibility of the identifying witnesses by noting that the crime occurred at night, in a park with lots of trees, and at a party attended by hundreds of people. *Id.* at 4. The court also noted that counsel had underscored Petitioner's lack of motive and presented the argument that another individual, Bush, had a motive to kill Spencer. *Id.*

In response to Petitioner's specific claims of ineffective assistance, the court rejected Petitioner's argument that counsel should have moved to reopen the suppression hearing, concluding that the evidence at trial did not advance counsel's argument made at the suppression hearing that Petitioner had an expectation of privacy in the premise where he was arrested. *Id.* at 5–6. The court also rejected the argument that counsel should have pursued an intoxication defense, finding that the evidence was insufficient to support that defense because the witnesses at trial made clear that Petitioner was behaving normally and purposefully without signs of intoxication. *Id.* at 6–7. Finally, the court rejected Petitioner's argument that counsel should have secured the attendance of Bush to testify on Petitioner's behalf, determining that Petitioner had failed to support his claim that testimony from Bush would have advanced his case. *Id.* at 7–8. Moreover, the court concluded that the strength of the evidence against Petitioner at trial left no reasonable possibility that Bush's allegations were true. *Id.*

17

Petitioner unsuccessfully sought leave to appeal the order denying his motion to vacate to the Appellate Division. *See* ECF No. 8-8; ECF No. 8-10.

### vi.  Petition for a Writ of Habeas Corpus

Petitioner filed the instant *pro se* petition, dated November 13, 2023, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See generally* ECF No. 3.  Construed liberally, his petition raises four primary grounds for relief: (1) the lineup was unduly suggestive and violated his right to due process; (2) the recording of Bass's 911 call was improperly admitted into evidence at trial; (3) he was deprived of a fair trial by certain comments that the prosecutor made on summation; and (4) his trial counsel provided ineffective assistance by failing to: (a) move to reopen the suppression hearing to explore whether Petitioner had an expectation of privacy in the premise where he was arrested and thus whether the police had arrested him in violation of *Payton*; (b) argue for a possible intoxication defense; and (c) secure the attendance of Bush to testify on Petitioner's behalf at trial. *Id.* at 4–5.[6]

Respondent opposes the petition, arguing that Petitioner is not entitled to habeas relief on any of the grounds raised. *See* ECF No. 7.

---

[6] Petitioner also appears to argue that habeas relief should be granted because the state court relied on "inadequate procedural bars" to deny him an evidentiary hearing on his C.P.L. § 440.10 motion, which denied him "meaningful representation, effective assistance of counsel, and a fair trial." ECF No. 3 at 5.  A state court's refusal to hold an evidentiary hearing does not present a federal constitutional issue, however, and thus is not cognizable on federal habeas review. *See, e.g.*, *Diaz v. Greiner*, 110 F. Supp. 2d 225, 235–36 (S.D.N.Y. 2000).

## II.    Discussion

### a.  Standard of Review

A person in state custody pursuant to a state-court judgment may seek a writ of habeas corpus on the ground that he is being held "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C § 2254(a).  In order to obtain relief, the petitioner must demonstrate, *inter alia*, that he has: "(1) exhausted his potential state remedies; (2) asserted his claims in his state appeals such that they are not procedurally barred from federal habeas review; and (3) satisfied the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'), if his appeals were decided on the merits."  *Edwards v. Superintendent, Southport C.F.*, 991 F. Supp. 2d 348, 365–66 (E.D.N.Y. 2013).

AEDPA provides that an "application for a writ of habeas corpus . . . pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings," unless adjudication of that claim resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A decision on the merits is "contrary to . . . clearly established" federal law if the state court "(1) arrives at a conclusion opposite to one reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court has

on a set of materially indistinguishable facts." *Dale v. Russell*, No. 24-CV-00143, 2025 WL 486686, at \*4 (E.D.N.Y. Feb. 13, 2025). "A state court decision is an 'unreasonable application' of clearly established federal law if the state court identifies the correct controlling legal principle announced by the Supreme Court but unreasonably applies that principle to the facts of the petitioner's case." *Id.* "The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable[;] . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

### b. Exhaustion

A petitioner seeking habeas relief must also demonstrate that he has exhausted his remedies available in state court. *See* 28 U.S.C. § 2254(b)(1). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, affording the courts the "opportunity to pass upon and correct alleged violations" of the petitioner's federal rights. *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks and citation omitted). In doing so, the petitioner must inform the state courts "about both the factual and legal bases for the

20

federal claim." *Ramirez v. Att'y Gen. of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001). The exhaustion requirement is fulfilled only when the petitioner's claims have been presented to the highest court of the pertinent state. *Id.*

In the instant case, Respondent does not argue that Petitioner failed to exhaust his claims in state court. Indeed, Petitioner raised his claims regarding the lineup, Bass's 911 call, and the prosecution's summation on direct appeal, and he raised his ineffective assistance of counsel claims in his C.P.L. § 440.10 motion. He subsequently sought leave to appeal from both orders denying his appeal and his § 440.10 motion. Accordingly, Petitioner's claims are exhausted.

### c. Merits

#### i. Suppression of Lineup Identifications

Petitioner argues that the pretrial lineup was unduly suggestive because he was placed with fillers who did not resemble him and who were older and weighed less than him, denying Petitioner his right to due process. ECF No. 3 at 4.[7]

---

[7] In his reply brief, Petitioner also argues that the lineup was impermissible because the identifying witnesses had "prior contact and corroboration with each other before or after process." ECF No. 10 at 3. Petitioner did not raise this claim in his original petition, and therefore he cannot raise it in his reply brief. *See Rosario v. Laclair*, No. 20-CV-5475, 2024 WL 4476165, at *16 n.13 (S.D.N.Y. Oct. 11, 2024) ("[T]o allow petitioner to raise . . . new claims on reply would undermine AEDPA's purpose of preventing abuse of the writ by piecemeal litigation of claims."). In any event, this assertion is belied by the record. The police officer who arranged the lineup testified that Bass and Pippins had no contact the day of the lineup. *See* ECF No. 7-1 at 37–39. Moreover, Pippins testified that she did not know Bass, *see id.* at 454, and both Pippins and Bass testified that, when they were at the police station for the

21

A defendant's right to due process includes the right not to be the object of pretrial identification procedures that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *See Simmons v. United States,* 390 U.S. 377, 384 (1968). "A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." *Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir. 2001). However, "[t]here is no requirement that a suspect in a lineup be surrounded by people identical in appearance." *Tavarez v. LeFevre*, 649 F. Supp. 526, 530 (S.D.N.Y. 1986). If the procedure was not unduly suggestive, then the identification evidence presents no due process obstacle to admissibility, and no further inquiry is required. *Raheem*, 257 F.3d at 133. If the procedure is found to be impermissibly suggestive, the court must determine if the "totality of the circumstances" establishes that the identification was independently reliable. *See Manson v. Brathwaite*, 432 U.S. 98, 110–14 (1977). If the court concludes that the identification was independently reliable, the identification may nevertheless be admitted. *Raheem*, 257 F.3d at 133.

At the suppression hearing in the instant case, the trial judge heard testimony and reviewed photographs of the lineup and determined that "the lineup was devoid

---

lineup, they waited in rooms with closed doors by themselves or with only family members, *see id.* at 397, 469–70.

of any suggestion." ECF No. 7-1 at 95. The judge observed that "[t]he lineup participants closely resemble [Petitioner], including approximate age, skin tone, and facial hair." *Id.* at 95–96. The trial judge also stated that, looking at the photograph of the lineup, "it is clear that none of the participants appear significantly older or younger than any of the others" and that "it is . . . impossible . . . to discern the precise height or the precise weight of the individuals in the lineup as they are seated . . . holding not just the sheet but wearing the same outfit, a loose-fitting hospital gown covering their bodies, and holding large numbers." *Id.* at 97. On appeal, the Appellate Division upheld these findings, concluding that "the fillers sufficiently resembled [Petitioner]" and thus "the lineup identification procedures were not unduly suggestive." *Dunaway*, 172 N.Y.S.3d at 111.

A state court's factual findings with respect to the suggestiveness of a lineup are presumed correct unless rebutted with clear and convincing evidence to the contrary. *See, e.g.*, *Espiritu v. Haponik,* No. 05-CV-7057, 2012 WL 161809, at *6 (S.D.N.Y. Jan. 19, 2012) ("[A]ll of the factual findings of the state court regarding the suggestiveness of the lineup must be presumed correct in the absence of clear and convincing evidence to the contrary." (citing 28 U.S.C. § 2254(e)(1))). Petitioner has not set forth clear and convincing evidence to rebut the state court's finding that the fillers sufficiently resembled him. Although it is undisputed that the fillers in the lineup weighed less than Petitioner and that two of the fillers were older than Petitioner, this alone is not enough to constitute an unduly suggestive lineup,

particularly given the steps that the police officers took to minimize any differences in appearance between Petitioner and the fillers. *See, e.g.*, *Campbell v. McCarthy*, No. 19-CV-2980, 2020 WL 8258241, at *9 (S.D.N.Y. Aug. 19, 2020) (finding that lineup was not unduly suggestive even though defendant was "markedly younger" than fillers), *report and recommendation adopted*, 2021 WL 229608 (S.D.N.Y. Jan. 22, 2021); *Stallings v. Heath*, No. 11-CV-4894, 2012 WL 735399, at *11 (S.D.N.Y. Mar. 7, 2012) ("[W]hile the fillers were between 20 to 123 pounds heavier than [petitioner], the lineup was not unduly suggestive based on disparate weights since the lineup participants were seated, with their lower bodies covered and their torso largely covered by their number cards."), *report and recommendation adopted*, 2012 WL 1538513 (S.D.N.Y. May 2, 2023).   Accordingly, the Appellate Division's determination that the lineup was not unduly suggestive was not contrary to, or an unreasonable application of, federal law.[8]

## ii.  Admittance of 911 Call

Petitioner argues that he is entitled to habeas relief because the trial court erroneously admitted into evidence portions of Bass's call to 911 without a proper foundation and in violation of state law, violating Petitioner's right to due process. ECF No. 3 at 4.  Construing his *pro se* petition liberally, Petitioner contends that the

---

[8] Having so concluded, it is not necessary to consider the parties' arguments regarding the independent reliability of Pippins's and Bass's identifications of Petitioner.

call should not have been admitted into evidence under the excited utterance or the present sense impression exception to the hearsay rule because Bass did not state on the call that she personally saw the shooting and because she in fact could not have observed the shooting given that her view was obstructed by trees and other people in the park. *See* ECF No. 10 at 3. He further contends that Bass's trial testimony that she saw the shooting is insufficient to establish this fact because she had time to reflect on her testimony after the events at issue and therefore her testimony is "inherently unreliable." *See* ECF No. 7-2 at 31.

A federal court "may not issue the writ [of habeas corpus] on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). "For a federal court to grant relief to a *habeas* petitioner, he must demonstrate that the allegedly erroneous state court evidentiary rulings violated an identifiable *federal* right." *Gutierrez v. McGinnis*, No. 00-CV-395, 2003 WL 21782628, at *3 (S.D.N.Y. July 31, 2003). In other words, to constitute an error of constitutional magnitude sufficient for habeas relief, "erroneously admitted evidence must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Osbourne v. Heath*, No. 12-CV-1138, 2015 WL 1548947, at *13 (E.D.N.Y. Apr. 8, 2015) (internal quotation marks and citation omitted). To determine whether an evidentiary ruling warrants habeas relief, the court must first determine "whether the trial court's evidentiary ruling was erroneous under New York law." *Id.* If the ruling was erroneous under

New York law, then the court must evaluate "whether the error amounted to the denial of the constitutional right to a fundamentally fair trial." *Id.*

In the instant case, the trial judge admitted Bass's 911 call as an excited utterance, finding that Bass's statements on the call were made while she was "hysterical" and under the stress of the shooting. ECF No. 7-1 at 111–12. The trial judge also determined that "[t]here is no way [Bass's statements] could be the product of the declarant's studied reflection in any way, shape, or form." *Id.* at 112. In coming to this conclusion, the judge observed that Bass would testify at trial that she had observed the shooting and could be cross-examined on this point. *Id.* at 110, 114. Separately, the judge also determined that the 911 call could be admitted as a present sense impression because of "the contemporaneity of it, minimizing any possibility of calculated misstatement," and because the statements were corroborated. *Id.* at 113–14.

The Appellate Division upheld the admission of the 911 call, concluding that "the People laid a proper foundation for the admission of a recording of a 911 call into evidence under the excited utterance and present sense impression exceptions to the prohibition on hearsay." *Dunaway*, 172 N.Y.S.3d at 111–12. With respect to Petitioner's claim that the call should not have been admitted because Bass did not state that she observed the shooting, the Appellate Division found that "the People demonstrated that the witness had personally observed the subject events through

her trial testimony that she had witnessed [Petitioner] shooting the victim, which testimony was elicited before the recording was admitted into evidence." *Id.* at 112.

The admission of Bass's 911 call into evidence as an excited utterance or present sense impression was not erroneous under New York law. An "excited utterance" is made "contemporaneously or immediately after a startling event which asserts the circumstances of that occasion as observed by the declarant." *People v. Edwards*, 392 N.E.2d 1229, 1231 (N.Y. 1979). An excited utterance is admissible if "the surrounding circumstances reasonably justify the conclusion that the remarks were not made under the impetus of studied reflection." *People v. Brown*, 517 N.E.2d 515, 519 (N.Y. 1987). For a statement to qualify as an excited utterance, "it must be inferable that the declarant had an opportunity to *observe personally* the event described in the [spontaneous] declaration." *People v. Cummings,* 99 N.E.3d 877, 881 (N.Y. 2018) (internal quotation marks and citation omitted). Present sense impression declarations, on the other hand, "are descriptions of events made by a person who is perceiving the event as it is unfolding." *People v. Portious,* 160 N.Y.S.3d 103, 105 (N.Y. App. Div. 2022) (internal quotation marks and citation omitted).

Here, Bass was clearly under the "stress of excitement caused by" the shooting during the 911 call. *See Edwards*, 392 N.E.2d at 1231. Bass told the 911 operator that her brother "was shot a couple of times" in the head and chest and begged for help, repeating "[p]lease, please" and asking the operator to "[p]lease come." ECF

27

No. 7-3 at 8.  The 911 operator, in response, told Bass that she needed to stop "panicking."  *Id*.  Bass then described Petitioner as the shooter, including his appearance and clothing.  *Id.*  She also provided Petitioner's name to the 911 operator and noted that he had "just walked off."  *Id.*  Given these circumstances and the fact that Bass testified at trial that she personally viewed the shooting, the Appellate Division's determination that the 911 call could be admitted into evidence as an excited utterance or present sense impression was proper and not contrary to state law.  *Cf. People v. Fratello*, 92 N.Y.2d 565, 571 (1998) (indicating that court could infer that declarant had personally observed startling event from the circumstances).

Moreover, even if the statements on the 911 call were erroneously admitted, Petitioner was not denied a fair trial.  There was overwhelming other evidence pointing to his guilt, including the testimony of Bass and Pippins at trial that they observed Petitioner shooting Spencer and James's testimony that she had seen Petitioner with a gun in the park several hours before the shooting.  Thus, the challenged statements in Bass's 911 call could not have had a substantial and injurious effect on the jury's verdict, and any alleged evidentiary error was harmless.  *See Coleman v. Squilliante*, No. 06-CV-13518, 2008 WL 4452351, at *10 (S.D.N.Y. Oct. 2, 2008) (considering challenged statement in light of other evidence admitted at trial to determine whether defendant was deprived of a fair trial).  Petitioner is therefore not entitled to habeas relief on this ground.

28

### iii. Prosecution's Summation

Petitioner argues that statements made by the prosecutor during his summation amounted to prosecutorial misconduct and thus Petitioner is entitled to habeas relief.  In particular, Petitioner asserts that the prosecutor's "remarks that defendant shoot to kill were not a fair comment on the evidence where defendant wasn't the shooter."  ECF No. 3 at 4.  In his direct appeal, Petitioner also challenged the prosecutor's remarks that characterized Petitioner as "arrogant," "bullying," and "belligerent," as well as the prosecutor's statements that suggested that the witnesses who testified on behalf of the prosecution did so despite facing intimidation from Petitioner, arguing that these statements deprived of him of due process and a fair trial.  ECF No. 7-2 at 33–37.

Petitioner raised this claim on direct appeal, and the Appellate Division found that Petitioner's objections to the prosecutor's summation were not preserved for appellate review because defense counsel "either did not object to the subject remarks or made one word objections that were based on different grounds than he raises on appeal."  *Dunaway*, 172 N.Y.S.3d at 112.  The Appellate Division also found that "where the Supreme Court gave curative instructions, [Petitioner] did not object to the instructions or request additional instructions, and his post-summations motion for a mistrial was untimely and failed to preserve his contentions."  *Id.* Finally, the Appellate Division concluded that the challenged remarks were "largely

proper as fair comments on the evidence and fair responses to the defense summation," and that any improper remarks were harmless error. *Id.*

Petitioner's claim is procedurally barred from federal habeas review because the Appellate Division dismissed his challenges to the prosecution's summation on an independent and adequate state law procedural ground—namely, that they were not preserved for appellate review. A claim is procedurally barred from federal habeas review if the state court's decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). When a claim is procedurally barred, a petitioner can only obtain federal habeas relief if he can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law" or that failure to consider the claim will result in a "fundamental miscarriage of justice." *Id.* at 750. "To show cause for failing to preserve a claim, Petitioner must show some external impediment preventing counsel from constructing or raising the claim." *Degree v. Corey*, No. 21-CV-11012, 2024 WL 947028, at *7 (S.D.N.Y. Jan. 19, 2024) (internal quotation marks and citation omitted). Examples of an external impediment include: "1) a showing that the defendant was represented by counsel who was constitutionally ineffective; (2) a showing that the factual or legal basis for a claim was not reasonably available at the time of default; or (3) interference by state officials that made compliance with the procedural mechanism impracticable." *Id.*

30

Under New York law, to appeal a ruling or instruction of a criminal court during a trial or proceeding, the party claiming error must have objected to the ruling "at the time of such ruling . . . or at any subsequent time when the [trial] court had an opportunity of effectively changing the same." C.P.L. § 470.05(2); *see also Portes v. Capra*, 420 F. Supp. 3d 49, 57 (E.D.N.Y. 2018). This rule, known as the contemporaneous objection rule, requires, "at the very least, that any matter which a party wishes" to preserve for appellate review be "brought to the attention of the trial court at a time and in a way that gave [it] the opportunity to remedy the problem and thereby avert reversible error." *People v. Luperon*, 85 N.Y.2d 71, 78 (1995). This rule is "firmly established and regularly followed," and it serves as an independent and adequate state law ground upon which to bar a petitioner's claim from federal habeas review. *Whitley v. Ercole*, 642 F.3d 278, 286–88 (2d Cir. 2011); *see also Portes*, 420 F. Supp. 3d at 57. Thus, because the Appellate Division concluded that Petitioner had not preserved his arguments regarding the prosecutor's summation for appellate review, and because Petitioner has not demonstrated cause for his failure to preserve these challenges or argued that a fundamental miscarriage of justice would result from a failure to consider his claim, his claim is barred from federal habeas review.

In any event, Petitioner's claim also fails on the merits. Prosecutorial misconduct violates a defendant's due process rights only when it is of "sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v.*

*Miller*, 483 U.S. 756, 765 (1987) (internal quotation marks and citation omitted).

"To properly evaluate the prosecution's actions, the alleged misdeeds must be placed in context, and '[t]he severity of the misconduct, curative measures, and the certainty of conviction absent the misconduct are all relevant to the inquiry.'" *Green v. Herbert*, No. 01-CV-11881, 2002 WL 1587133, at *17 (S.D.N.Y. July 18, 2002) (quoting *Blisset v. LeFevre*, 924 F.2d 434, 440 (2d Cir. 1991)), *report and recommendation adopted*, Sept. 5, 2002 ECF Order. Under New York law, statements during summation are permissible if they constitute a "fair comment on the evidence" at trial and reasonable inference therefrom or a "fair response to remarks made by the defense counsel during summation." *See People v. Perez,* 794 N.Y.S.2d 439, 440 (N.Y. App. Div. 2005).

Here, the challenged comments during the prosecutor's summations did not deny Petitioner a fair trial. Witnesses at trial testified that Petitioner was angry, yelling, and picking fights with people leading up to the shooting of Spencer. The testimony also established that Petitioner flashed his gun at his cousin and stated that he "shoot[s] to kill." *See* ECF No. 7-1 at 362. The prosecutor's challenged comments and descriptions of Petitioner as arrogant, bullying, and intimidating were fairly based on this evidence. *See United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992) ("A prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation."). Similarly, the prosecutor's statements about the witnesses testifying despite intimidation, read in context, can be seen as a direct

response to defense counsel's argument that the identifying witnesses lacked credibility. *Cf. Velazquez v. Poole*, 614 F. Supp. 2d 284, 314–15 (E.D.N.Y. 2007) (holding that prosecutor's comments in summation that witness was "careful" and that the jury "[could] rely on her" were direct response to defense counsel's argument that the witness's testimony was vague and lacking in detail). Moreover, the trial judge instructed the jury that they could not consider arguments not based on evidence and that the testimony about the Love and Loyalty event was only provided as background information. Finally, the evidence against Petitioner was overwhelming, and thus it is almost certain that Petitioner would have been convicted absent the challenged comments. In light of these considerations, the prosecution's challenged remarks did not deny Petitioner a fair trial. Petitioner is thus not entitled to habeas relief on this ground.

### iv.  Ineffective Assistance of Counsel

Finally, Petitioner claims that his trial counsel was constitutionally ineffective for: (1) failing to move to reopen the suppression hearing after testimony at trial that Defendant was found at the home of a "possible girlfriend" to explore whether Petitioner had an expectation of privacy in the arrest location and thus whether his arrest violated *Payton*; (2) failing to pursue an intoxication defense; and (3) failing to call Bush to testify at trial. ECF No. 3 at 4–5.

To establish ineffective assistance of counsel, a petitioner must show: (1) that his counsel's performance was unreasonable under "prevailing professional norms"

33

and (2) that, but for the deficiency, there is a reasonable probability that "the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). In assessing reasonableness of performance, the court must view the petitioner's claim through the eyes of trial counsel, rather than through the "distorting effects of hindsight." *Id.* at 689. In addition, courts must "indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance," and that counsel's decisions were, under the circumstances, sound trial strategy. *Id.*

In the habeas context, where a petitioner challenges under § 2254 the state court's denial of his *Strickland* claim, "a petitioner must show not only that counsel's performance fell below the *Strickland* standard but also that the state court's adjudication of the *Strickland* standard was *itself* unreasonable." *See Prescott v. Lee*, No. 11-CV-482, 2013 WL 1192784, at *10 (E.D.N.Y. Mar. 22, 2013). "The standards created by *Strickland* and § 2254(d) are both highly deferential," and a federal collateral attack on a state court's *Strickland* ruling is therefore subject to a "doubly" deferential standard. *Harrington*, 562 U.S. at 105 (internal quotation marks and citations omitted). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.* at 101.

### 1. Failure to Move to Reopen Suppression Hearing

Petitioner first argues that his trial counsel was ineffective for failing to move to reopen the suppression hearing pursuant to C.P.L. § 470.40(4) and C.P.L.

§ 470.15(6)(a) following Detective Rosado's testimony at trial that Petitioner was arrested at the house of his girlfriend or "possible girlfriend." ECF No. 3 at 4. ECF No. 7-1 at 722. According to Petitioner, this testimony established that he had an expectation of privacy in the home where he was arrested and thus that his arrest violated *Payton*. *See* ECF No. 7-5 at 19; ECF No. 8-4 at 23.

The trial court, in denying Petitioner's C.P.L. § 440.10 motion, concluded that it was reasonable for trial counsel to decline to move to reopen the suppression hearing on *Payton* grounds because Detective Rosado's testimony did not warrant such a motion. The court reasoned that, for one, the trial court had previously rejected the argument that Petitioner had an expectation of privacy in the premise where he was arrested as an "invited guest," finding "zero evidence in this record that [Petitioner] had an expectation of privacy in the premises where he was apprehended, zero." ECF No. 8-7 at 5–6. Moreover, the state court found that, because the New York Court of Appeals has concluded that the suppression of evidence of a lineup identification made after an arrest based on probable cause but in violation of *Payton* is not required, it was reasonable for trial counsel to decline to move to reopen the hearing to reargue a *Payton* violation because "there would have been nothing to suppress." *Id.* at 6 (citing *People v. Jones*, 810 N.E.2d 415, 419–22 (N.Y. 2004)).

Petitioner has not established that the state court acted unreasonably in determining that his counsel did not provide ineffective assistance of counsel under

*Strickland*.  Under New York law, a suppression hearing may be reopened upon a showing that the defendant has "discovered 'additional pertinent facts' that 'could not have [been] discovered with reasonable diligence before the determination of the motion.'"  *People v. Kindell*, 23 N.Y.S.3d 65, 67 (N.Y. App. Div. 2016) (quoting C.P.L. § 710.40(4)).  Here, Petitioner would have known whether he was arrested at his girlfriend's residence and could have raised this point at the suppression hearing, therefore it is not an "additional pertinent fact" that could not have been discovered earlier such that it would have warranted reopening the hearing.  *Cf. Jones v. Cronin*, No. 20-CV-05348, 2022 WL 21853203, at *9–10 (S.D.N.Y. Apr. 29, 2022) (denying habeas petitioner's argument that counsel was ineffective for failing to move to reopen suppression hearing where petitioner "offered no additional pertinent facts that could not have been discovered earlier with due diligence"), *report and recommendation adopted*, 2023 WL 8643800 (S.D.N.Y. Dec. 14, 2023).  Moreover, Petitioner's counsel argued at the suppression hearing that Petitioner had an expectation of privacy as an invited guest and the state court rejected this argument on the merits because Petitioner explicitly told the arresting officers that he lived in Brooklyn.  Accordingly, Petitioner's counsel reasonably could have concluded that any argument that Petitioner had an expectation of privacy in the residence because it was the home of his girlfriend would have also been rejected on the merits.

Furthermore, as the state court found, even assuming that Petitioner's counsel had moved to reopen the suppression hearing and the state court had found that there

36

was a *Payton* violation, the lineup identifications made after Petitioner's arrest would still be admissible because the arrest of Petitioner was based on probable cause. New York courts have consistently declined to suppress lineup identifications following *Payton* violations where the arrest of the defendant was based on probable cause. *See e.g.*, *Jones*, 810 N.E.2d at 419–22; *People v. Riffas*, 994 N.Y.S.2d 136, 137 (N.Y. App. Div. 2014). Petitioner therefore cannot demonstrate prejudice under the second prong of *Strickland*, and his claim is accordingly denied.

### 2. Failure to Raise Intoxication Defense

Petitioner next argues that his trial counsel was ineffective for failing to inform him of a possible intoxication defense and failing to raise an intoxication defense at trial. ECF No. 3 at 4–5.

Petitioner raised this claim in his C.P.L. § 440.10 motion, and the trial court found that it was without merit, concluding that "[i]t was reasonable for trial counsel to forego an intoxication defense as [Petitioner] never claimed that he was intoxicated [and] the record was insufficient to support an intoxication charge." ECF No. 8-7 at 6. The court also concluded that it was strategically reasonable for counsel to decline to mount an intoxication defense because his trial strategy was to argue that Petitioner was misidentified as the shooter. *Id.*

Petitioner has not shown that the state court acted unreasonably in denying this claim. The Supreme Court has stated that "where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime

charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Hill v. Lockhart,* 474 U.S. 52, 59 (1985). Petitioner has failed to put forth any evidence that establishes that an intoxication defense would have succeeded at trial. Under New York law, intoxication is not a complete affirmative defense to a criminal charge; rather it can reduce the severity of the offense by negating the specific intent element of the crime charged. *People v. Harris,* 779 N.E.2d 705, 712 n.4 (N.Y. 2002) (citing N.Y. Penal Law § 15.25). However, "[w]hile the requisite level of intoxication need not be to the extent of depriving the accused of all power of volition or of all ability to form an intent, the degree of intoxication that a defendant must demonstrate is quite high." *Velasquez v. Ercole*, 878 F. Supp. 2d 387, 408 (E.D.N.Y. 2012) (internal quotation marks and citation omitted).

In the instant case, there was minimal evidence introduced at trial that would have supported an intoxication defense. Although James testified that Petitioner appeared drunk during the afternoon of August 20, 2016 and that she saw him drinking later in the evening at the Love and Loyalty event, *see* ECF No. 7-1 at 313, 316, 319, this testimony only indicates that Petitioner was drinking several hours before the shooting occurred. Without more, this testimony is insufficient to support an intoxication defense. *See People v. Gaines*, 638 N.E.2d 954, 955 (N.Y. 1994) (suggesting that an intoxication defense must be supported by evidence "such as the number of drinks [consumed], the period of time during which they were consumed,

the lapse of time between consumption and the event at issue, whether [alcohol was] consumed [] on an empty stomach, whether [the] drinks were high in alcohol content, and the specific impact of the alcohol upon [defendant's] behavior or mental state"). Moreover, Bass testified that she had a conversation with Petitioner approximately an hour and a half before the shooting in which he appeared "normal," and on cross-examination she testified that she had not seen anyone "drunk and out of control" in Shady Park.  *See* ECF No. 7-1 at. 357–58, 399, 427, 429.

Additionally, defense counsel's strategy at trial was to argue that the identifying witnesses could not have seen the shooting clearly because the park was dark and there were many trees and people around.  In light of this strategy, it was reasonable for defense counsel to choose not to also present an intoxication defense because doing so may have confused or alienated the jury.  *See Williams v. Walker*, No. 92-CV-1905, 1993 WL 22128, at *6 (S.D.N.Y. Jan. 26, 1993) ("Although it would not have been impossible for counsel to argue inconsistent and alternative theories to the jury, 'competent trial counsel know that reasonableness is absolutely mandatory if one hopes to achieve credibility with the jury.'" (quoting *White v. Singletary,* 972 F.2d 1218, 1221 (11th Cir. 1992))).  Thus, Petitioner has not shown that an intoxication defense was likely to have succeeded at trial, nor has he shown that the state court unreasonably applied *Strickland* in finding that his counsel was not ineffective for declining to pursue an intoxication defense.  He is therefore not entitled to habeas relief on this ground.

39

### 3. Failure to Call Witness at Trial

Finally, Petitioner argues that his counsel was ineffective for failing to call Bush as a witness at trial. ECF No. 3 at 5. In his motion to vacate the judgment, Petitioner alleged that Bush would have testified that he saw another assailant shoot Spencer and that Bass and Pippins were not close enough to the shooting to have been able to identify the shooter. ECF No. 8-4 at 23–24. Petitioner submitted an unsigned, unsworn, undated document, ostensibly drafted by Bush, to the trial court with his motion to vacate judgement, in which Bush stated that he "was with [Spencer] when he was killed" and that he "saw the guy that kille[d] [Spencer]" and that it "was not Raheem."[9] *Id.* at 126–27.

Petitioner raised this claim in state court in his C.P.L. § 440.10 motion, and the state court found that defense counsel "exercised sound trial strategy" in attempting to persuade the jury that the eyewitnesses could not have seen the shooting and that Bush had in fact committed the shooting. ECF No. 8-7 at 8. The state court also noted that because Bush's declaration, provided by Petitioner, was unsworn, unsigned, and undated, the only evidence supporting Petitioner's claim was his own assertions. *Id.* at 7–8. Finally, the court concluded that "in view of the

---

[9] In his reply brief, Petitioner briefly asserts that his counsel was also ineffective in failing to call Bush because of a "conflict of interest." ECF No. 10 at 7. As discussed above, Petitioner cannot raise a claim for the first time in his reply brief. *See Rosario*, 2024 WL 4476165, at *16 n.13. Moreover, there is no support in the record for Petitioner's undeveloped claim that his counsel had a conflict of interest.

strength of the evidence against [Petitioner], there is no reasonable probability that [his] allegations of fact are true." *Id.* at 8.

Petitioner has not established that the state court's application of *Strickland* to this claim was unreasonable. "The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir. 1987). "Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed." *United States v. DeJesus*, 57 F. App'x 474, 478 (2d Cir. 2003); *accord Harris v. Hollins*, No. 95-CV-4376, 1997 WL 633440, at *6 (S.D.N.Y. Oct. 14, 1997) (concluding that counsel was not ineffective for failing to call alibi witnesses where counsel presented a vigorous defense). This applies even to witnesses that may offer exculpatory evidence. *See United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000).

Here, Petitioner's counsel did not act unreasonably in failing to call Bush at trial. Defense counsel attempted to convince the jury that Bass and Pippins misidentified Petitioner as the shooter. In doing so, he suggested that Bush was the actual shooter, relying on testimony at trial about prior incidents between Bush and Spencer. It was reasonable for counsel to conclude that the jury would be more likely to believe that the identifying witnesses misidentified Petitioner than to accept Bush's testimony that an unknown third person killed Spencer, particularly because Bush's testimony would have directly contradicted the testimony of Spencer and

41

Bass, forcing the jury to make credibility determinations. *Cf. Lawson v. Caspari*, 963 F.2d 1094, 1095–96 (8th Cir. 1992) (concluding that counsel was not ineffective for failing to call alibi witnesses he did not believe were credible, particularly where counsel extensively cross-examined the state's witnesses and presented a theory of self-defense). In light of these considerations, the state court did not apply *Strickland* unreasonably in finding that Petitioner's counsel did not provide ineffective assistance by failing to call Bush to testify at trial.

## III.    Conclusion

The petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability shall not issue. *See* 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

Brooklyn, New York
August 1, 2025

*Edward R. Korman*
Edward R. Korman
United States District Judge